**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| MATTHEW ETZENHOUSER and ) | |
| TAIGA S. ROHRER ) | |
| (On behalf of themselves and a class of similarly ) | |
| situated individuals), ) | |
| ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No.: |
| ) | |
| ) | |
| THOMAS J. VILSACK, ) | |
| SECRETARY, ) | |
| U.S. DEPARTMENT OF AGRICULTURE ) | |
| 1400 Independence Ave., S.W. ) | |
| Washington, DC 20252 ) | |
| *In his official and individual capacities* ) | |
| ) | JURY TRIAL DEMANDED |
| ) | CLASS ACTION COMPLAINT |
| JEWEL H. BRONAUGH ) | |
| FORMER DEPUTY SECRETARY, U.S. ) | |
| DEPARTMENT OF AGRICULTURE ) | |
| Virginia State University, College of Agriculture ) | |
| Box 9081 ) | |
| 1 Hayden ) | |
| Dr. Petersburg VA 23806 ) | |
| *In her individual capacity* ) | |
| ) | |
| ) | |
| U.S. DEPARTMENT OF AGRICULTURE ) | |
| 1400 Independence Ave., S.W. ) | |
| Washington, DC 20252 ) | Date: November 27, 2023 |
| ) | |
| ) | |
| ) | |
| *Defendants*. ) | |

---

## <u>CLASS ACTION COMPLAINT</u>

1)      COMES NOW, Plaintiff, MATTHEW ETZENHOUSER AND TAIGA S.

ROHRER, on behalf of themselves and a class of similarly situated individuals ("Putative class members" or "Plaintiffs"), by and through their attorneys, Lloyd, Lemmon, & Hale, PLLC, and hereby state the following in support of their Class Complaint and Jury Demand against Defendant U.S. Department of Agriculture ("USDA" or the "Department"), Thomas J. Vilsack, Secretary, U.S. Department of Agriculture, and Jewell Bronaugh, former Deputy Secretary (together "Defendants"), and allege:

## **INTRODUCTION**

2) Part of USDA's mission, as the "People's Department," (as President Lincoln so named it) is "[t]o serve all Americans by providing effective, innovative, science-based public policy leadership in agriculture, food and nutrition, national resource protection and management, rural development, and related issues . . ."

3) Its website states, "Equity is not an add-on or extra; it is central to the Department's mission."

4) In the way that the Department treated the Plaintiffs, it fell far short of its mission and ideals.

5) As described below, USDA forced Plaintiffs to defend their beliefs in the face of a vaccine mandate that created a culture of hostility and contempt for people who were simply trying to live according to their faith.

6) In doing so, USDA promised to provide religious accommodations to the vaccine "as required by law," but failed in its duty not to unduly burden employees' religious beliefs – must less give such beliefs "favored treatment," as required by law.

7) Defendants required Plaintiffs, who could not take the vaccine without sacrificing

their religious beliefs, to succumb to illogical, unapproved, and invasive restrictions, such as mandatory testing, which in many cases further violated Plaintiffs' religious beliefs.

8) Plaintiffs lived under constant duress, including threat of discipline and termination, and some suffered actual termination through constructive discharge.

9) Defendants' mandatory policies not only threatened Plaintiffs' jobs and their livelihoods but stripped Plaintiffs of their ability to come to work or to travel for important assignments required by their jobs, resulted in many Plaintiffs being placed on unpaid leave or even AWOL status, and forced some out of their jobs because of the intolerable working environment USDA created and fostered.

10) Through it all, Defendants harassed, shamed, "outed," segregated, ostracized, and excluded religious believers who objected to the vaccine mandate because of their religious beliefs.

11) By not accommodating Plaintiffs, Defendants violated Plaintiffs' right to religious freedom and failed entirely in their duty to defend Plaintiffs sincerely held religious beliefs and protect them from discrimination.

12) Defendants failed to accommodate Plaintiffs' sincere religious beliefs, discriminated against Plaintiffs for those beliefs, and created a toxic work environment by forcing Plaintiffs to wear individually identifiable symbols, test in a manner that invited public scrutiny, and tended to isolate the Plaintiffs from co-workers socially.

13) USDA's policies and practices also disparately and negatively impacted people of faith who objected to the vaccine and in some case, testing.

14) Finally, USDA's actions against Plaintiffs, including unwanted comments, insults, and even wide-spread communications which were tantamount to bullying and battering sincere religious believers, are evidence that USDA also discriminated against Plaintiffs by treating them

as disabled – as if they were pariahs who were infected with a deadly disease and were spreading it, notwithstanding that employees who had been fully vaccinated were also acquiring and transmitting COVID-19.

15) The Department took these actions and set up a separate and more burdensome process for religious accommodation for those with religious objections to the COVID-19 vaccine in support of its clear and unequivocal mission to "render being unvaccinated so burdensome that those who haven't received shots will have little choice other than to get them."[1]

16) Defendants violated Title VII of the Civil Rights Act, the Rehabilitation Act, and the Religious Freedom Restoration Act ("RFRA" herein) when they pressured and coerced Plaintiffs to violate their religious beliefs by taking the vaccine and following testing restrictions, failed to accommodate Plaintiffs' religious beliefs, and treated Plaintiffs as if they were disabled.

**PARTIES**

17) Named Plaintiff Matthew Etzenhouser is professional Forester working for the U.S. Department of Agriculture Forest Service at the Rocky Mountain Regional Office in Lakewood, Colorado. He has worked for the agency for over 20 years. His duties include wood product valuation, timber sale and stewardship, contract oversight, and other forest management activities. He is a Christian with religious beliefs that conflict with taking the COVID-19 vaccine.

18) Plaintiff Taiga S. Rohrer was a Forest Fire Management Officer with U.S. Department of Agriculture, Forest Service, on the Tonto National Forest. He had 35 years of U.S. Government public service, with 18 years in the Forest Service.

19) Defendant U.S. Department of Agriculture employs approximately 100,000

---

[1] Maegan Vasquez, *Biden announces measures to incentivize COVID-19 vaccinations, including a requirement for federal employees*, CNN.com, (July 29, 2021), available at: https://www.cnn.com/2021/07/29/politics/joe-biden-vaccination-requirement-announcement/index.html.

employees including Plaintiffs at all times relevant to this Complaint. It is headquartered at 1400 Independence Ave. S.W., Washington, D.C., 20253.

20)     Defendant Thomas J. Vilsack is an individual who serves as the Secretary of the USDA. As the most senior leader at the Department, Mr. Vilsack is responsible for implementing the COVID-19 vaccine policy and bears ultimate responsibility for the Department's actions against Plaintiffs. Mr. Vilsack's work location is USDA headquarters in Washington D.C. Plaintiffs are suing Mr. Vilsack in his official capacity, and only in his official capacity, for their Title VII claims. Plaintiffs are suing Mr. Vilsack in his individual capacity, and only in his individual capacity, for violations of RFRA.

21)     Defendant Jewel H. Bronaugh is an individual who served as Deputy Secretary of the USDA from May 2021 to March 2023. She was responsible for the implementation and administration of USDA's COVID-19 policy, working directly under Secretary Vilsack. Plaintiffs are suing Ms. Bronaugh in her individual capacity, and only her individual capacity, for violations of RFRA.

## JURISDICTION AND VENUE

22)     This Court has jurisdiction according to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e-16(c)), the Rehabilitation Act of 1973 (29 U.S.C. § 794(a)), and the Religious Freedom Restoration Act ("RFRA") (42 U.S.C. §20000bb-1(c) and 42 U.S.C. § 2000e 5(f)(3)).

23)     This Court also has jurisdiction under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1343(a)(4), 1346, and 1361.

24)     Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(e)(1)(B) because the United States, one or more of its agencies, and one or more of its officers in his or her official capacity are Defendants, and a substantial part of the events giving rise to Plaintiffs' claims

occurred in this District, and the relevant employment records are stored at the GSA headquarters in Washington D.C.

**STATEMENT OF FACTS**

**Vaccine Mandate**

25)     On September 9, 2021, the President issued Executive Order ("EO") 14043, which required all federal employees to be vaccinated with one of three vaccines available for COVID-19, which had been in pandemic status for over a year, "subject to such exceptions as required by law." 86 Fed. Reg. 50989. EO 14043 tasked every federal agency with implementing the EO to the extent consistent with applicable law. *Id.* at 50990. The Agencies were to receive "implementation" guidance from the SFWTF, which would issue guidance within seven days. *Id.*

26)     Simultaneously, the President stated that while "fully vaccinated" individuals are "highly protected from severe illness even if [they] get COVID-19," and being fully vaccinated renders these individuals "as safe as possible," he was nonetheless issuing vaccine mandates "to protect vaccinated workers from unvaccinated co-workers." Katie Rogers & Cheryl Gay Stolberg, *Biden Mandates Vaccines for Workers, Saying, 'Our Patience Is Wearing Thin,'* NEW YORK TIMES, (September 9, 2021, updated November 12, 2021), at https://www.nytimes.com/2021/09/09/us/politics/biden-mandates-vaccines.html.

27)     As early as August 2021, it was public knowledge that while the vaccine may work well in preventing severe illness and death, it did "not prevent transmission" of the disease, particularly as it related to the Delta variant, which comprised 93% of all cases at the time. Holcombe and Maxouris, *CDC head says COVID-19 vaccines prevent severe illness and death, but they can't prevent transmission*, CNN.COM, (August 16, 2021), at https://www.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-

6

21/h_61de1502e86060f5faf4477339928e33. *See also,* Singanayagam, Ankia, PhD, et al, *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study*, The Lancet, Infectious Diseases, October 29, 2021, https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext (British study finding that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts"); Dr. Rochelle Walensky, CDC Director, Statement during CNN, *The Situation Room* interview with Wolf Blitzer, August 5, 2021 ("What the vaccine can't do anymore is prevent transmission").

28) In other words, the vaccination status of USDA employees was irrelevant to mitigating the risks of transmission of COVID.

## USDA's Implementation of the Mandate

29) Despite the inefficacy of the vaccine in spreading disease, USDA implemented the vaccine mandate pursuant to EO 14043, and in doing so, created a standoff between enforcement of what was later deemed an illegal mandate and the sincerely held religious beliefs that Plaintiffs hold dear.

30) USDA Secretary Thomas Vilsack oversaw the implementation of the vaccine mandate, assisted to a large extent by Deputy Jewell Bronaugh.

31) USDA required that all employees show proof of vaccination in the fall of 2021. Deputy Secretary Bronaugh stated they must "submit proof of full COVID-19 vaccination, or submit a request for a legal entitled accommodation, including medical and religious by November 9, 2021, or have appropriate disciplinary action initiated against them, up to and including removal

from Federal service." USDA Deputy Secretary Jewel Bronaugh email to [all employees], November 3, 2021.

32) USDA required all employees to be fully vaccinated by November 22, 2023, absent being granted a legally valid exception. The memo stated,

> The policy is designed to reduce infection rates and contain the global pandemic . . . All USDA employees getting vaccinated [*sic*] is important to keeping our families, our children, our co-workers, and our customers safe. To reiterate, the expectation is that all USDA employees will be fully vaccinated by Nov. 22nd. Employees may contact their Human Resources Director, reasonable accommodation or religious accommodation coordinator to request a medical or religious accommodation.

Memorandum from Chief Randy Moore to Employees, *From the Chief's Desk; Update: Mandatory vaccine requirement and return to the workplace*, September 22, 2021, pg. 4 (forwarding latest USDA COVID-19 guidance from Secretary Vilsack and Deputy Secretary Bronaugh).

33) Secretary Vilsack himself called the injection "a noble responsibility."

34) Plaintiffs interpreted his comment to imply that anyone who objected to the vaccine was dishonorable and base.

35) USDA created a disciplinary process for non-compliance with the vaccine mandate. It called on leaders to initiate the enforcement process "with a brief period of education and counseling (5 days), including providing employees with information regarding the benefits of vaccination and ways to obtain the vaccine . . . If the employee does not demonstrate progress toward becoming fully vaccinated . . . by the end of the counseling and education period," the leader was directed to apply "a *short* suspension (14 days or less)." It went on to say, "Continued noncompliance during the suspension can be followed by proposing removal." Deputy Chief Angela Coleman, *Desktop chats; Difficult conversations on the vaccine requirement*, October 18, 2021, pages 3-4 (referencing "full consequences" of not getting the vaccine from the SFWFT website).

36)     The Department reinforced its message via email, video conference, town halls, and meetings, to ensure the maximum number of employees would take the injection. In fact, Plaintiff Rohrer counted nearly 400 such communications he had received from the Department, notwithstanding he had filed two religious accommodation requests and was waiting for disposition.

37)     Plaintiffs received these communications from Secretary Vilsack, Deputy Secretary Bronaugh and other leaders as bullying and harassment, given their pending accommodation requests, and the lack of focus that they contained regarding legitimate religious objections to the vaccine.

**Novel Religious Accommodation Process**

38)     Despite having a long-standing process and form for filing religious accommodation requests, USDA created a different process by which to request a religious accommodation than had been in place before mandate.

39)     On or around October 2021, the USDA Office of Human Resources Management ("OHRM") published form "Request for Religious Exception to the COVID-19 Vaccination Requirement," to be used by Department employees solely for requesting accommodations to the COVID-19 vaccine.

40)     The new form required more responses and required religious believers to go into more detail regarding their religious beliefs than the existing form.

41)     In addition to inquiring about the nature of Plaintiffs' objection to the vaccine and how it burdened their religion, it also challenged Plaintiffs by asking how long they had held such religious beliefs (as if Plaintiffs were making up new beliefs just to avoid the jab), whether they had taken other vaccines as an adult, what those vaccines were and when? USDA also required

Plaintiffs to explain why they may have taken other vaccines but would not take the COVID-19 injection. Defendants even required Plaintiffs to share whether they had objections to other medicines "or products" based on their religious beliefs.

42)     Department guidance stated, "there is no requirement to use a particular format, including the USDA OHRM form . . . Going forward, employees may choose to use this revised form but there is no obligation to do so." Crystal Gist – ASCR email to Joyce Mitchell, February 3, 2022.

43)     Yet, the Department required Mr. Etzenhouser and Mr. Rohrer to complete this new form after they had already filed their accommodation requests on a different form and after the deadline for the first dose of the vaccine had passed.

44)     Employee Relations Specialist Johnna Robertson, Esq., wrote to Mr. Rohrer that the new form had been published, stating the "answers to these new questions are needed to determine if you are entitled to a legal exception from the vaccine mandate. . . If you choose not to complete the attached form, management may not have sufficient information to conclude that you are a legally entitled to an exception."

45)     The religious accommodation process in place prior to the vaccine mandate allowed supervisors to work with HR to determine whether a religious accommodation could be granted.

46)     According to the previous process, religious believers could request an accommodation at any time.

47)      The complete process typically took no more than 30 days.

48)     After the mandate, the Department set deadlines for filing accommodation requests that seemed not to relate to any need for the particular deadline.

49)     The Department furthermore warned leaders such as Mr. Rohrer that he had no

authority to make decisions about vaccine or testing accommodations.

50)    The Department never adjudicated most religious accommodation requests related to the COVID-19 vaccine mandate.

**Plaintiffs, their exemption requests, and USDA's Failure to Accommodate**

51)    Plaintiff Matthew Etzenhouser is professional Forester working for the USDA Forest Service at the Rocky Mountain Regional Office in Lakewood, Colorado.

52)    He has worked for the agency since 2003.

53)    His duties include wood product valuation, timber sale and stewardship, contract oversight, and other forest management activities.

54)    Mr. Etzenhouser's annual performance evaluations have been successful or higher for every year since he started with the Department.

55)    Most years he also received performance-based awards.

56)    Throughout his career with the U.S. Forest Service Mr. Etzenhouser had never received any reprimand or other disciplinary actions prior to the COVID-19 pandemic.

57)    His conduct has always been professional and courteous.

58)    He is qualified to perform his job.

59)    Mr. Etzenhouser is a Roman Catholic" who believes that taking the COVID-19 vaccine would make him complicit in a "mortal sin," in part because it was tested and/or developed using aborted fetal cells.[2]

---

[2] *See, e.g.*, Fred Guterl, *COVID-19 Vaccines and Fetal Tissue: The Science and Controversy Explained*, NEWSWEEK, March 21, 2021, at https://www.newsweek.com/covid-19-vaccines-fetal-tissue-science-controversy-explained-1575863. ("Fetal-cell lines played a vital role in the development of all three vaccines. Moderna and Pfizer used Van der Eb's original cell line, called HEK 293, in the testing of their coronavirus vaccines—that is, scientists first developed the vaccines using their mRNA technologies and subsequently tested them on lab-cultured HEK 293 cells, ancestors of the original cells that Van der Eb took from an embryo almost 50 years ago. Johnson & Johnson used a different fetal-cell line, called PER.C6, that was cultured in Van der Eb's lab in 1995. While Moderna and Pfizer used fetal cells for testing their vaccine after it was already produced, J&J used fetal cells as tiny "factories" that produced the active ingredient in its vaccine.")

60)     He states:

> Due to my religious conviction, I could not participate in any of the COVID-19 status reporting, masking, testing or "vaccination" requirements. I am a very devout traditional Roman Catholic. I attend the Latin Mass, pray the Rosary every day and live the message of Fatima. I sincerely believe that any complicity with the COVID-19 control measures would be a mortal sin. . .

> Through the millennia of human existence this natural defense has played a providential role of changing a pandemic to an endemic disease. Now we are told herd immunity can only be reached through an artificial vaccination. If I remain complicit in these measures, it is telling God that I put my trust in this immoral, man-made plan (that I do not believe in) over objective truth, God's providence and my natural immune system. This is the first condition of a mortal sin.

> In relation to taking the "vaccine" it is a particularly grievous mortal sin because it is tainted with aborted fetal cells. . . In traditional Catholic belief, a mortal sin separates us from God, and my love for God will not allow me to commit this type of sin. Due to my faith, I was not able to comply with the order from Secretary Vilsack. On September 29, 2021, I submitted the documents to obtain a religious accommodation to forgo status reporting, masking, testing and inoculation.

61)     On September 29, 2021, Mr. Etzenhouser filed documents to obtain a religious accommodation to forgo the vaccine as well as the testing and related protocols.

62)     He filed Form AD-1163R_RA (08/21) which he believed to have been the form used to request religious accommodations prior to the vaccine.

63)     Mr. Etzenhouser also attached a full single-spaced document outlining his religious beliefs and how they conflict with the vaccine.

64)     After a month with no response from the Department, on October 28, 2021, Human Relations Specialist Andrea Contreras required Mr. Etzenhouser to complete a new form to request an accommodation to the vaccine. Ms. Contreras did not explain why she required him to complete the form a second time.

65)     Mr. Etzenhouser never received a response to his request for a religious

accommodation to the vaccine and testing. In fact, he heard nothing back from the Department until February 17, 2022, when the Department notified him (and other putative class members) that it was pausing enforcement of the vaccine requirement due to a U.S. District Court order enjoining the federal government mandate.

66)     The Department made clear however, that the pause was "temporary," and that the injunction may be "supplemented, modified, or vacated depending on the course of ongoing litigation."

67)     Despite temporarily suspending the vaccine mandate, USDA did not suspend the forced testing and masking requirements or in any way ease restrictions related to travel, working in the office or firefighting.

68)     Firefighting was a significant source of extra income for Mr. Etzenhouser.

69)     Mr. Etzenhouser was not permitted to engage in any of these activities because even after the Department paused the vaccine mandate, the Department continued to ignore his religious accommodation to testing and masking filed on September 29, 2021.

70)     When it eventually did respond, the Department failed to address the testing and masking accommodations he made and focused only on the vaccination portions.

71)     Mr. Etzenhouser repeatedly requested updates from Ms. Contreras regarding his testing accommodation request.

72)     USDA finally responded to Mr. Etzenhouser by informing him he would need to re-submit documentation to make a new request for an exemption from the testing and related protocols, which he did on June 6, 2022.

73)     By August 5, 2022, 11 months after filing his original religious accommodation request, Defendant still had not adjudicated his request, or even spoken to him about it.

74) USDA finally responded to Mr. Etzenhouser's status request that same day stating, "My apologies for the delay. I am waiting for guidance regarding your request. I have not received that guidance as of yet but will follow up." Cherrisse Clayton email to Matthew Etzenhouser, August 5, 2022.

75) The Department finally terminated the testing requirement for all Plaintiffs on August 22, 2022, but since the vaccine mandate pause was still temporary, Mr. Etzenhouser continued to live under constant fear and anxiety of losing his job.[3]

76) He continued to lose pay because he could not fight fires (due to the continued masking requirement), and also suffered long-term impact in his ability to maintain his firefighting qualifications that were based in part on regular and continuous engagement in fire suppression activities.

77) Mr. Etzenhouser was isolated from coworkers who were permitted to come into the office when it reopened. His emotional and psychological well-being suffered substantially and created a significant amount of stress that he still feels to this day.

78) He went from being an "obedient, professional and productive employee" who had never needed to utilize the EEO or accommodation processes to feeling "as though my diligent and professional career development over three decades of service as a professional Forester is being undermined and I am considered a disruptive and unwanted liability to the Agency because of my religious convictions."

79) Tiaga Rohrer's annual performance evaluations have been successful, and usually higher for every year since he started the federal government.

80) Most years, he also received performance-based awards.

81) Throughout his federal career, Mr. Rohrer had never received any reprimand or other disciplinary actions, and his conduct has always been professional and courteous.

82) He is qualified to perform his job.

83) Mr. Rohrer is a Christian who has sincerely held religious beliefs that conflict with the COVID-19 vaccine.

84) He states:

> I believe in the power of God and my relationship with him to guide me through the ethical and moral forays in life through meditation, prayer, & scripture. The vaccines were developed and/or tested using aborted fetal cells or derived cell lines directly conflicting with my personal religious beliefs. With this knowledge, to take such a vaccine would be a sin, a direct offense to God's word, principles of Christianity, and would condone the ultimate immorality of the act of murder in order to buy temporary safety of my physical body which would be an outrageous destruction of my faith in and relationship with God. My religious beliefs, including God's gift of free will, conclude this forced vaccination and the vaccines are fundamentally immoral and unethical, and denies the ability to follow my religious beliefs. In my prayers, discussions with God, & guidance in scripture, he pointed me to loving and helping others to honor him and to have faith in him alone. As such I have genuine and sincere religious beliefs that will not allow me to accept this vaccination and if forced to would be a violation of my faith in, and relationship with, God, and my spiritual integrity, not to mention civil rights as such.

85) Mr. Rohrer filed a request for a religious accommodation to the vaccine on September 28, 2021.

86) In Mr. Rohrer's case, Employee Specialist Johnna Robertson, Esq., confirmed receipt of his accommodation request on October 18, 2021, but required him to complete, "a new government-wide/USDA-wide form [that] was released [October 8, 2021] that includes several questions that were not included in previous religious accommodation forms."

87) The new form included many more questions about employees' religious beliefs

that Mr. Rohrer felt were onerous and intrusive.

88)   Mr. Rohrer placed a "read-receipt" on the email he sent to Ms. Robertson with his second accommodation request on October 25, 2021.

89)   He he did not receive the read receipt until February 17, 2022 indicating that his employer finally opened it.

90)   Forty-five minutes later he received a form email from USDA explaining that because of the nation-wide injunction against enforcing the vaccine, which was issued just a few weeks prior by the U.S. District Court for the Southern District of Texas, the Department was temporarily pausing processing his request for accommodation.

91)   The timing of his receipt of notice that USDA finally opened his email demonstrates that USDA only opened it for the sole purpose of responding with a form letter.

92)   Other than that single form email from the Department, the Department never communicated to Mr. Rohrer about his accommodation request.

93)   Since he filed a request for a religious accommodation to the vaccine, Mr. Rohrer was required to test weekly pursuant to the USDA's newly implemented Screening Testing Program.

94)   He objected to the testing requirement but did not file for an exemption in part because the agency threatened that he would not be able to participate in firefighting or fire management if he did not test, even if he did receive an accommodation to testing.

95)   Fire management was the main responsibility of Mr. Rohrer's role.

96)   At a Regional Forest Fire Management Office ("FFMO") meeting in the spring of 2022, the agency stated that employees who do not test would not be permitted to engage in fire suppression activities, even if they had submitted a religious accommodation request to the testing.

97) In fact, the agency made clear the prior fall that "even if a Reasonable Accommodation is given [to be exempt from the vaccine] it may be changing their jobs out of fire." Statement of Jake Nuttal, Acting National Fire Director, at R3 Regional FFMO Meeting, October 25, 2021.

98) The agency made these threats at regional fire meetings for all to hear – that even if they requested and received accommodations to the vaccine and to testing, they would not be permitted to participate in fire suppression.

99) Accordingly, Mr. Rohrer knew as early as October 2021 that his job was on the line (since his job and his career were fire-fighting) even if his religious accommodation was granted.

100) He also applied for but was denied a promotion to Regional Assistant Fire Director for Operations, the same role the agency had strongly considered him for in a different region.

101) He was qualified for this position and had more experienced than the person who got the job. That person declined the opportunity because he was offered his current position.

102) As a leader of over 200 employees, Mr. Rohrer was familiar with the hiring process and witnessed first -hand how leadership did not want "the hassle" and delay associated with hiring employees who filed religious accommodations to the vaccine.

103) In addition, there were several other positions Mr. Rohrer did not apply for because leaders through the Department were aware of his religious opposition to the vaccine and he knew he would not be hired.

104) Because of his religious beliefs against the vaccine, Mr. Rohrer was ultimately forced to resign given the animus toward employees seeking religious accommodations to the vaccine.

105) He retired several years early, involuntarily, forgoing substantial retirement pay and

benefits.

106) Mr. Rohrer suffered mental, physical, moral, and spiritual injury, which was too much to continue working at the Department. Because he was forced to resign, he suffered financial injury in terms of income and retirement pension.

107) In contrast to the treatment that Plaintiffs received as religious believers, the Department finalized guidance on *medical* accommodations and began processing them by November 21, 2021.

108) As of the same date, however, the Department was "still waiting for guidance regarding religious accommodation." FS National Pandemic Liaison, Shannon Downey email to Forest Service employees, November 22, 2021.

109) Meanwhile, the Secretary of Agriculture threatened Plaintiffs' employment on December 22, 2022, stating that January 3, 2023, would "mark[] the start of issuance of proposed notices of suspensions."

110) Evidence exists that USDA did not even open or read Mr. Rohrer's accommodation request (after requiring him to complete it or jeopardize his exemption request) until the District Court issued the temporary injunction, over three months after he filed it. Presumably USDA only opened the email to respond to with a notice that the mandate was being temporarily paused. There is no indication they even read it and they certainly never acted upon it.

111) Likewise, USDA never adjudicated Mr. Etzenhouser's vaccine accommodation request.

112) Nor did USDA ever engage in the required interactive process with either Plaintiff. It did not reach out for more information, ask questions, understand religious beliefs, or consider what accommodations either Plaintiff recommended.

113) Instead, they involuntarily enrolled Mr. Rohrer, Mr. Etzenhouser and all Plaintiffs in their mandatory testing program.

## USDA's Involuntary Testing Screening Program

114) USDA officially rolled out its COVID-19 testing in spring of 2022. Covid-19 Testing and Guidance for USDA Employees, April 28, 2022 ("Testing Policy").

115) The mandate applied to all Plaintiffs, whom Defendants automatically (and involuntarily) enrolled in the program because they had filed religious objections to the vaccine.

116) The testing program required employees who had not submitted proof that they were fully vaccinated to undergo COVID-19 testing "in any week they were working in a facility or worksite where the COVID-19 Community Level [indicating the spread of the disease] is medium or high."

117) USDA required supervisors or other "designated officials" to observe Plaintiffs during their testing, specifically watching "the employee swabbing their nose," but were not required to wait for test results. Defendants required Plaintiffs to conduct the testing via videoconference if they were not able to be in person.

118) Plaintiffs were embarrassed and humiliated by this process.

119) Defendants created a disciplinary process for failure to take the forced tests:

If an employee refuses to take a required COVID-19 test or refuses to provide the results of a test, management should first ask the employee if they wish to use accrued leave or Leave Without Pay (LWOP). Management should grant requests to use accrued leave or LWOP unless mission requirements or operational needs precludes management from approving the leave. If an employee does not elect to use accrued leave or LWOP, management should inform the employee that the employee may be put in AWOL status if the employee continues to refuse to be tested or to provide the results of their test. Employees who are AWOL may be subject to progressive discipline, up to and including removal from Federal service.

Testing Policy at 7.

120) Employees were permitted to file reasonable accommodation requests to be exempt from testing, and several did, including Mr. Etzenhouser.

121) While determination of accommodation requests were pending however, the Testing Policy allowed the Department to "prevent an employee from entering the worksite, direct telework or administrative leave if appropriate, and allow the employee to use accrued leave or Leave without Pay. *Id.*

122) That is exactly what USDA did to Mr. Etzenhouser. The problem is that determination of accommodation requests were pending indefinitely because Defendants never acted upon them.

### Continued Failure to Accommodate

123) Defendants never responded to Mr. Etzenhouser's testing request nor did they adjudicate it. Indeed, like the vaccine accommodation requests, Defendants did not engage in any interactive process or communication with Mr. Etzenhouser about his request – even requiring him to re-submit his request some eight months after he first requested it, presumably because they lost it.

124) USDA did not permit Plaintiffs like Mr. Etzenhouser to enter a USDA facility or worksite located in a county with a medium or high COVID-19 Community Level, even though they had filed a religious accommodation to the testing requirement.

125) While their accommodations were "indefinitely pending," Defendants instructed such employees to request leave or leave without pay or said they would be considered AWOL, which may lead to disciplinary action.

126) USDA now maintains these restrictions were actually accommodations to Mr. Etzenhouser's religious exemption request to the vaccine.

127) Yet, the Department never communicated any accommodations, and upon

information and belief, did not internally report them or treat them as accommodations which they granted.

128) Even USDA's Testing Policy indicates they were restrictions to put in place while religious accommodations were pending. Testing Policy at 7 ("Pending a determination of the [accommodation] request, the agency or office may *prevent* an employer from entering the worksite, direct telework or administrative leave if appropriate and allow the employee to use accrued leave or Leave Without Pay") (emphasis added)).

129) Leadership had promised that it would "facilitate the *respectful and interactive conversation* between the employee and supervisor that is *crucial* to the process of considering accommodation requests."

130) USDA, howver, did not engaged in any timely interactive process and did not timely follow up with Plaintiffs to seek more information or understanding about their beliefs and their requested accommodations to the vaccine and testing requirements.[4]

131) These anecdotal facts about USDA's treatment of Named Plaintiffs are proven out by USDA's own reporting. Upon information and belief, USDA only granted approximately one percent of all accommodation requests to the vaccine, and that number included both medical religious exemption requests. Accordingly, the number of religious exemption requests that USDA ultimately granted was less even than one percent of those requested.

132) The Department's actions caused Mr. Rohrer "extreme concern, massive stress and anxiety about [his] job, career, future, family and ability to support [his] family," all of which he loved.

---

[4] Defendants did finally meet with Mr. Etzenhouser, but only about his request to be exempt from the mask mandate. This meeting did not occur until September 2022, well after the vaccine mandate was paused and the testing requirement was suspended.

133) He hoped to stay in the Department and prepare for retirement at mandatory fire fighter retirement age (after 35 years of service), but he and his family suffered emotionally, spiritually, financially and even physically.

134) The situation became so toxic that he was forced to leave the service effective August 31, 2022, having seen the writing on the wall that his employer considered him a trouble-maker who would never be promoted.

135) This intolerable working environment was reinforced by statements from senior leaders such declaring that employees who did not attest to having taken the injection would be "the first to have adverse personnel actions, as "the low hanging fruit," and the "first cut for adverse actions."

136) These statements evidence the heavy-handed culture of oppression that Plaintiffs felt and why it was intolerable for Mr. Rohrer to continue to work at the Department.

137) Likewise, Defendants restricted Mr. Etzenhouser's ability to return to the office until USDA lifted the testing mandate in August 2022 because USDA had never responded to his request for an accommodation to testing.

138) Further, Mr. Etzenhouser was not permitted to re-engage in fire suppression work until June 2023, when his supervisor finally decided he could travel to work in fire as long as the location of the fire was not experiencing a high hospital admission level.

139) Finally, upon information and belief, USDA did not require vaccinate attestation or testing for non-USDA employees, including contractors, volunteers, customers, or official visitors to its worksites.

140) Likewise, it did not confirm that employees who received one injection were fully vaccinated and remained so with boosters as necessary.

141)     Indeed, these facts show that the Department treated similarly situated people who did not have religious objections to the vaccine more favorably than those who did.

### Exhaustion of Administrative Remedies

142)     On November 22, 2022, Mr. Etzenhouser filed a class complaint with the EEOC for discrimination based on USDA's COVID-19 policies and practices. On August 17, 2023, the EEOC issued a Notice of Right to Sue and on August 29, the USDA Center for Civil Rights Enforcement issued a Final Agency Decision ("FAD"). This action is hereby filed within 90 days of Mr. Etzenhouser's receipt of the FAD.

143)     Mr. Rohrer was a part of this putative class.

144)     Accordingly, Plaintiffs properly exhausted their respective administrative remedies under Title VII prior to filing this action.[5]

### CLASS ALLEGATIONS

145)     Certification of a class is appropriate in this action, under Fed. R. Civ. P 23(a) and (b)(3) with Plaintiffs Matthew Etzenhouser and Taiga Rohrer as representative class agents.

146)     The proposed class consists of all employees who worked for USDA during the pandemic who filed a religious exemption request to the vaccine which was not granted.[6]

147)     "Congress designed [Rule 23] to promote the efficient and economical conduct of litigation." *Adair v. England*, 209 F.R.D. 5, 8 (D.D.C. 2002) (*citing Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974)). A class action generally enables courts "to treat common claims together, obviating the need for repeated adjudications of the same

---

[5] Mr. Rohrer also filed a claim of discrimination against USDA (and the National Fire Service) on February 12, 2022. Mr. Rohrer filed an appeal of that decision and October 26, 2022 and is still awaiting disposition.
[6] Plaintiffs plan to include a potential subclass of employees whose religious exemptions to the COVID-19 testing and related protocols were not granted, pending information produced during discovery.

issues." *Id.* (*citing In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir. 1995)).

148)    In determining whether to certify a class, the court should not consider the underlying merits of the plaintiffs' claims and must accept the plaintiffs' claims as true for purpose of certification. *Id.* (*citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974) (internal quotation marks omitted)).

149)    The court should rule on the class status "as soon as practicable after the commencement of an action is brought as a class action."

150)    Moreover, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *Id.* (*citing In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001).

151)    Federal Rule of Civil Procedure 23(a) provides four criteria for courts to determine whether class certification is appropriate:

    i)      The class is so numerous that joinder of all members is impracticable;

    ii)     there are questions of law or fact common to the class;

    iii)    the claims or defenses of the representative parties are typical of the claims or defenses of the class;

    iv)     and the representative parties will fairly and adequately protect the interests of the class.

152)    Fed. R. Civ. P 23(a). *See also Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019).

153)    In addition to the requirements of Rule 23(a), the class must also be maintainable under one of Rule 23(b)'s class action types. Fed. R. Civ. P. 23(b). S*ee also Harris v. Med. Transp.*

*Mgmt., Inc.*, 77 F.4th 746, 757 (D.C. Cir. 2023).

Numerosity

154)    A proposed class action satisfies the numerosity prerequisite if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

155)    Plaintiffs need not provide a specific number "as long as they give a reasonable basis for their estimate." *Adair*, 209 F.R.D. at 8 (*citing In re Lorazepam*, 202 F.R.D. at 26).

156)    In this case, there are at least 18 parties who desire to be or already are named plaintiffs in this class action.

157)    In addition, USDA employs nearly 100,000 people.

158)    The White House takes credit for achieving a 98% vaccination rate among the federal workforce. Executive Order 14,099, 88 FR 30891, (May 9, 2023) ("Following issuance of those orders, my Administration successfully implemented a vaccination requirement for the Federal Government, the largest employer in the Nation, achieving a 98 percent compliance rate (reflecting employees who had received at least one dose of the COVID–19 vaccine or had a pending or approved exemption or extension request by January 2022")

159)    This number is much higher than the true vaccination rate because it includes workers with pending exemption requests, presumably including Plaintiffs.

160)    Even so, assuming only two percent remain unvaccinated for religious or medical reasons, that leaves approximately 2000 employees who likely filed for accommodations to the vaccine and were denied. Upon information and belief, medical exemption requests made up only a fraction of all accommodation requests (less than 15%). Accordingly, Plaintiffs estimate at least 1700 employees requested religious accommodations, with the vast majority (if not all) never receiving an accommodation.

161) The number of accommodation requests is likely many times higher, as demonstrated by the USDAs Department of Forestry's own records. Upon information and belief, as of January 2022, the Forestry Department had received 2711 requests for accommodation out of approximately 26,544 employees. That means approximately 10% of Forestry employees filed for an exemption to the vaccine. If that figure applies to all of USDA, approximately 10,000 employees filed for some sort of accommodation to the vaccine.

162) Again, assuming 85% of those were religious accommodations versus medical, it is fair to assume 8500 USDA employees filed for religious exemptions and most if not all, did not receive them.

163) This figure is again evidenced by USDA and Forestry's own records. Upon information and belief, by January 2022 (two months after the deadline to get injected with the vaccine), Forestry had granted only 30 accommodations out of 2711 (1.1%).

164) The members of the class are clearly ascertainable and are sufficiently numerous that joinder of all members is impracticable. Plaintiffs request limited discovery from USDA to confirm the accuracy of these statistics.

Commonality and Typicality

165) Fed. R. Civ. P. 23(a)(ii) requires that there are questions of law or fact that are common to the class. Thus, to satisfy the commonality requirement, the plaintiff must demonstrate common points of law and fact. *Adair*, 209 F.R.D. at 8 (c*iting Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).

166) Courts assess the commonality and typically requirements together. *Id.* (*citing Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)).

167) "The commonality requirement will be satisfied if the named plaintiffs share at least

one question of fact or law with the grievances of the prospective class." *Id.* (*citing Casey*, 43 F.3d at 56)).

168)     Here, the over-riding common question of law as to all Plaintiffs is whether DoD failed to accommodate Plaintiffs religious beliefs after they filed for religious accommodations. Resolution of this issue is "central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

169)     Defendants failed to accommodate Plaintiffs' requests for religious accommodations, leaving them without answers as to whether the government would make good on its threat to discipline and/or terminate them for failure to take the injection. Even after the injunction, which USDA clarified was only temporary, Plaintiffs continued to live in a state of fear and anxiety that they could lose their jobs at any moment.

170)     This issue is central to the case and is ripe for class certification because the entire class was injured by the same system-wide policy or practice and is capable of class-wide resolution. *Dukes*, 564 at 359. *See also Seals v. Austin*, 594 F. Supp. 3d 767 (N.D. Tex. 2022) (holding just as in this case that a common question applicable to all class members was "whether the Navy inappropriately discriminated against religious beliefs in compelling vaccination despite those beliefs, refusing to accommodate those beliefs, and granting exemptions for secular but not religious beliefs").

171)     A related question of fact is whether Defendants engaged in the required interactive process with Plaintiffs. Plaintiffs assert they did not. At no time did Defendants discuss reasonable accommodations to the vaccine (or to testing) with Plaintiffs. They did not seek additional information, question Plaintiffs about their beliefs, or engage in any bi-lateral discussion about possible reasonable accommodations – as required by law. *Ansonia Board of Education v.*

*Philbrook*, 107 S. Ct. 367, 370 (1986). Indeed, in Mr. Rohrer's case, Defendants did not even open his email and read it.

172)     Rather, it appears Defendants employed a blanket policy of inaction and avoidance, instead of the "respect and interactive conversation," USDA claimed was "crucial to the process of considering accommodation requests."

173)     Further, a common issue of fact is whether Defendants granted vaccination exemptions for secular reasons, as Plaintiffs assert they did.

174)     Finally, a central issue of law and fact common to all putative class members is whether USDA, as evidenced by its policies, statements and actions, perceived employees who objected to the vaccine as disabled, thus subjecting them to onerous and illogical testing, masking, social isolation and other restraints and harms not suffered by employees who did not object to the vaccine.

Typicality

175)     In terms of typicality, Named Plaintiffs' claims are typical and representative of all other plaintiffs.

> Typicality differs from commonality in that typicality concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims. Yet they "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical. To that end, the two inquiries 'tend to merge.'

*J.D. v. Azar,* 925 F.3d 1291, 1322 (D. D.C. 2019) (*citing Gen. Tel.*, 457 U.S. at 157 n.13).

176)     Accordingly, "typicality is ordinarily met if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Azar*, 925 F.3d at 1322.

177)     Here, Plaintiffs suffered from the same conduct by USDA as Mr. Etzenhouser and

Mr. Rohrer.

178) As noted above, USDA failed to accommodate all Plaintiffs religious beliefs by leveraging a strategy of inaction and delay, all the while keeping Plaintiffs on edge and fearful that their jobs could be taken away at any time.

179) Defendants involuntarily enrolled Mr. Etzenhouser, Mr. Rohrer and all Plaintiffs in the Screening Testing Program, and treated all Plaintiffs as if they were disabled.

180) All Plaintiffs lived under the same threat of discipline and termination as did Mr. Etzenhouser, Mr. Rohrer and suffered the same or similar stress, anxiety and fear of losing their jobs. Accordingly, Plaintiffs meet the typicality requirement of Rule 23(a).

<u>Adequacy of Representation</u>

181) The adequacy requirement of Rule 23(a) "aims to ensure that absent class members will not be bound by the outcome of a suit in which they were not competently and fairly represented." *J.D. v. Azar*, 925 F.3d at 1312 (*citing Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)).

182) There are two components of Adequacy. The class representative: (1) "must not have antagonistic or conflicting interests with the unnamed members of the class" and (2) "must appear able to vigorously prosecute the interests of the class through qualified counsel." *Id.* (*citing Twelve John Does v. District of Columbia*, 117 F.3d 571, 575, 326 U.S. App. D.C. 17 (D.C. Cir. 1997) (internal quotations omitted)).

183) Here, Mr. Etzenhouser and Mr. Rohrer are adequate representatives of the class. They have been through pre-litigation together as a class at the EEOC and have no reason to be antagonistic with each other or other Plaintiffs.

184) Both Mr. Etzenhouser and Mr. Rohrer are active members of the non-profit

organization, Feds for Freedom which is an organization that is comprised of over 8000 federal government employees who (like them) are fighting for the freedom of employees from government mandates and overreach such as was the case with the COVID-19 vaccine mandate

185)     Accordingly, both Named Plaintiffs share the same goal and have the same interests in seeing justice done in this case. There are no known or suspected conflicts between the Named Plaintiffs and the other putative class members.

186)     Further, Mr. Etzenhouser and Mr. Rohrer are zealous advocates for themselves and the putative class. Both, have been heavily engaged throughout the administrative process, filing claims, painstakingly collecting documentation and communicating with and leading the class.

187)     Mr. Etzenhouser has taken an active role in organizing the potential class members, obtaining their statements, making initial contact with counsel, and providing necessary follow-up.

188)     Mr. Rohrer has also been active, providing evidence and documentation, laying out facts, and digging for information.

189)     Both Named Plaintiffs are in all ways adequate to represent the interests of the class contemplated here.

<u>Maintainability</u>

190)     All certified classes must meet the threshold requirements of Rule 23(a) and be maintainable under one of Rule 23(b) classes. Harris, 77 F. 4th 746, (D.C. Cir. 2023).

191)     Here, class certification is appropriate under Rule 23(b)(3).

192)     Rule 23(b) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

193)　　This requirement is satisfied "when questions calling for individualized determination are outweighed by questions that are capable of classwide resolution." *Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 U.S. App. LEXIS 19028, *16 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869* (*Rail Freight II*), 934 F.3d 619, 622, 443 U.S. App. D.C. 86 (D.C. Cir. 2019) (internal quotations omitted).

194)　　This means that determination of their truth or falsity of such questions "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

195)　　Most of the Plaintiffs identified here have already proceeded together as a putative class through the administrative phase. Relief on behalf of one member of the putative class would necessarily apply to the entire class of individuals identified here and who have yet to be identified.

196)　　All of the class claims are based on USDA's agency-wide policies and practices, it's uniform implementation of those policies and the system-wide (though not identical) harms those policies caused.

197)　　All of the central issues of law and fact common to Plaintiffs are ascertainable and remediable "in one stroke," and are not based on individual circumstances or evidence.

198)　　For example, USDA applied the same policy of inaction as to all of Plaintiff's religious requests to be accommodated from the vaccine. Upon information and belief, Defendants ignored every Plaintiff's religious accommodation request to the vaccine and did not engage in any interactive process to find a reasonable accommodation.

199)　　Defendants involuntarily enrolled each religious objector into its screening testing program and then ignored the requests for accommodation to testing many of those people made. These issues are central to the case and can be resolved "in one stroke." No other issues predominate or are superior.

200) While some Plaintiffs may have more individualized evidence of negative comments and interactions with USDA workers, those anecdotal facts are not required to make the case.

201) Moreover, while some Plaintiffs received harsher treatment based on USDA's failure to accommodate their religious beliefs and suffered somewhat different harms, all Plaintiffs lived in fear that they would lose their jobs and their livelihoods because of their religious beliefs.

202) Indeed, all Plaintiffs were "given a Hobson's choice of lose your faith and keep your job or keep your faith and lose your job." *See e.g., Keene v. City & Cnty. Of San Francisco*, 2023 U.S. App. LEXIS 11807 *6 (9th Cir. April 18, 2023) (unpublished).

203) The substantial similarity in experience and in harm mitigates any interest of the individual class members' need to prosecute these claims. To the extent the harms differed, they fall within definable categories that are easily manageable.

204) A class action would be the superior method by which to adjudicate their claims because of the similarities of the experience of the individual members, who all experienced the same policies and the same culture within USDA.

<u>Relief Allegations</u>

205) Defendant's actions caused and continue to cause Mr. Etzenhouser, Mr. Rohrer, and other Plaintiffs devastating harm.

206) All USDA employees who filed religious exemptions to the vaccine lived in constant fear of being placed on AWOL status or losing their jobs and many made drastic changes in their finances, relationships, or living arrangements.

207) Many were unable to perform their jobs well because they were not allowed to enter work facilities or meet with clients, and many were denied travel opportunities for training and

development.

208)    Some Plaintiffs were prohibited from engaging in fire suppression activities, resulting in lost pay and other opportunities.

209)    Some Plaintiffs lost promotions and at least one was constructively discharged.

210)    Some Plaintiffs succumbed to testing under duress for fear of discipline or losing their jobs, and some Plaintiffs succumbed to the pressure to take the vaccine while waiting for their exemption requests to be adjudicated.

211)    Many suffered physical and mental health effects and were forced to take leave and / or seek medical help or emotional support due to the constant coercion to be vaccinated and the harassment created by being treated as disabled and a threat to others.

212)    Plaintiffs and class members are entitled to compensation for losses in earnings, promotional opportunities and employment benefits, injury to reputation and emotional distress – in amounts to be determined at trial.

**COUNT I**
**RELIGIOUS FREEDOM RESTORATION ACT**
**42 U.S.C. §2000bb *et seq.***

213)    Plaintiffs restate the foregoing paragraphs as set forth fully herein.

214)    RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion unless the Government demonstrates that application of the burden to the person is the least restrictive means of furthering a compelling interest." *Singh v. Berger*, 56 F.4th 88, 92 (D.C. Cir. 2022). *See also* 42 U.S.C. § 2000bb-1(b)(1)-(2)).

215)    A plaintiff makes out a *prima facie* claim under RFRA "by proving the following elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise

of religion." *Sample v. Lappin*, 479 F. Supp. 2d 120, 122 (D.D.C. 2007) (*citing Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001)).

216)     The court's scrutiny extends only to whether Plaintiffs "sincerely hold a particular belief and whether the belief is religious in nature." *Sample*, 479 F. Supp. 2d at 123 (citing Sample v. Lappin, 424 F. Supp. 2d at 193 (internal citations omitted)).

217)     If a plaintiff successfully makes out a prima facie case, the defendant then must show that the burden placed on the religious exercise is permissible. *Id. (citing Gartrell v. Ashcroft,* 191 F. Supp. 2d 23, 37 (D.D.C. 2002) (applying burden-shifting analysis under RFRA)).

218)     Here, Named Plaintiffs have sincere religious beliefs against the vaccine which they shared with Defendants. Defendants never challenged Plaintiffs' beliefs or suggested they were neither sincere nor religious.

219)     Here, Mr. Etzenhouser believes that to take the vaccine or engage in forced COVID-19 testing and related restrictions would be a particularly grievous mortal sin, in part because the vaccine was tested or developed using aborted fetal cells or cell lines and to turn against God's naturally created defenses is evil. As such, Mr. Etzenhouser believes taking the vaccine would separate him from God – potentially for eternity. The weight of that concern for a man of Mr. Etzenhouser's faith cannot be overstated. There is no greater harm to one's religious belief.

220)     Mr. Rohrer believes that since the vaccines were developed and/or tested using aborted fetal cells or derived cell lines directly the vaccine directly conflicts with his personal religious beliefs. He states, "With this knowledge, to take such a vaccine would be a sin, a direct offense to God's word, principles of Christianity, and would condone the ultimate immorality of the act of murder in order to buy temporary safety of my physical body which would be an

outrageous destruction of my faith in and relationship with God."

221)   Like Mr. Etzenhouser, Mr. Rohrer believes that to take the vaccine would destroy his relationship with God. Again, for a Christian, as for many other religions, there can be no greater harm than to be separated from God for eternity.

222)   The D.C. Circuit Court recently found religious beliefs unduly burdened in a case of harm that was more temporal in nature. See, e.g., Singh 56 F.4th at 94 ("denying a Sikh the right to wear a turban and maintain unshorn hair is perceived by followers as the most humiliating and hurtful physical injury that can be inflicted upon a Sikh") (emphasis added)).

223)   Defendants burdened the exercise of Plaintiffs' beliefs first by attempting to force them to take the vaccine under constant and coercive pressure, then by failing to act on or adjudicate their requests for reasonable accommodations to the vaccine (and in Mr. Etzenhouser's case to the testing).

224)   Throughout the pendency of their determination of Plaintiffs' religious accommodations, Defendants continued to pressure Plaintiffs to take the vaccine through a constant barrage of communications that insinuated, and in some cases outright alleged they were selfish, uncaring, negligent people, equivalent to those who "drive on the wrong side of the road fail to put their baby in a car seat."

225)   Yet, upon information and belief, Defendants did not require vaccines or testing of contractors, volunteers, customers or official visitors. In other words, they placed the worst possible type of burden on Plaintiffs' religious beliefs – and none at all on other categories of people (including workers) who came onto their facilities.

226)   Similarly, upon information and belief, Defendants did not place the same burden on employees who applied for and were granted medical (non-secular) accommodations to both

the vaccine and testing.

227)　"Government must, if able, afford religious exercise equal stature with other interests that it accommodates." *Id.* at 100-101 (*citing Tandon v. Newsom*, 141 S. Ct. 1294, 1297, 209 L. Ed. 2d 355 (2021) (rejecting regulations that treated some comparable secular activities more favorably than at-home religious exercise, without concluding that those activities pose a lesser risk of harm (internal quotations omitted))).

228)　Moreover, since the vaccine was not effective at spreading COVID-19, its enforcement was irrelevant to the safety of other employees. Yet the government (from the President down to the USDA and its many agencies), used safety as the purported rationale for the excessive burden they placed on religious believers such as Plaintiffs who opposed the vaccine.

229)　Plaintiffs had a clearly established right not to be forced to take the vaccine (and in some cases testing). As was clear from USDA's commitment to provide reasonable accommodations for religious beliefs, Defendants were fully of that established right and willfully obstructed enforcement by ignoring Plaintiffs' accommodation requests and subjecting them to the morale dilemma of choosing to keep their jobs or keep their faith.

**COUNT II**
**VIOLATION OF TITLE VII 42 U.S.C. § 2000e, *et seq.***
**RELIGIOUS DISCRIMINATION: FAILURE TO ACCOMMODATE**

230)　Plaintiffs restate the foregoing paragraphs as set forth fully herein.

231)　The claim is brought on behalf of Mr. Etzenhouser, Mr. Rohrer and the entire putative class.

232)　Under Title VII, a plaintiff alleging religious discrimination based on a failure to accommodate must show that:

> (1) she had a bona fide religious belief, the practice of which conflicted with an employment requirement; (2) that she informed defendant of the belief; and (3) she was disciplined for failure to comply with the conflicting employment requirement.

*Philbrook*, 107 S. Ct. at 370 (citing *Turpen v. Missourri-Kansas-Texas R. Co*., 736 F.2d 1022, 1026 (5th Cir. 1984)).[7]

233)   The Civil Rights Act of 1964, 42 U.S.C 2000e-2(a) (1) prohibits discrimination on the basis of religion. The Supreme Court has interpreted this provision to include an affirmative duty to accommodate religious belief:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual ... because of such individual's 'religious observance and practice.' An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an 'aspec[t] of religious ... practice,' it is no response that the subsequent 'fail[ure] ... to hire' was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 784 (2015) (internal citations omitted).

234)   The statutory framework for determining reasonable accommodation further requires an interactive process and participation by both the employer and the employee. *Philbrook*, 479 U.S. at 69 (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion

---

[7] The Circuit Court for the District of D.C has not articulated a framework for an employee's claim of failure to accommodate religious beliefs although it has looked to other courts for input. *See e.g., Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, 14 (D.D.C. 2016). However, at least one District Court argues that the showing of the third element that an adverse employment action (such as discipline or termination) occurred, may not be required and suggests Court's requiring it may be mistaken. *Prescott-Harris v. Fanning*, 2016 U.S. Dist. LEXIS 171360, *35-36 (D.D.C. Dec. 12, 2016). For purposes of this Complaint, it is not necessary to argue what Plaintiffs will ultimately need to prove since Plaintiffs are not required to plead a *prima facie* case at this point. *L'Association des Americans Accidentels v. United States Dep't of State*, 2023 U.S. LEXIS 23360 *10, (D.D.C. February 10, 2023) (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007) ("[t]o survive a motion to dismiss plaintiff must plead sufficient factual allegations to state a claims to relieve that is plausible in its face")).

and the exigencies of the employer's business"); *see also, Rashad v. Wash. Metro. Area Transit Auth.*, 945 F. Supp. 2d, 152 (D.D.C., 2013) ("It is clear [defendant] engaged in an extensive interactive process to accommodate [plaintiff's] requests and ultimately gave her the accommodation she wanted.").

235)   In this case, Mr. Etzenhouser and Mr. Rohrer have bona fide religious beliefs that conflict with the vaccine (and in Mr. Etzenhouser's case, COVID-19 testing).

236)   Both Named Plaintiffs made USDA aware of their beliefs by filing requests for religious accommodations to the vaccine (and in Mr. Etzenhouser's case, COVID-19 testing).

237)   Upon USDA's demand, Mr. Etzenhouser filed his accommodation claim three times and Mr. Rohrer filed his twice.

238)   Defendants failed to accommodate Named Plaintiffs by denying their requests for religious accommodation to the vaccine, and in Mr. Etzenhouser's case, for COVID-19 testing.

239)   Defendants failed to accommodate Named Plaintiffs' and putative class members' religious beliefs by delaying the response to their requests for religious accommodation and ultimately ignoring them completely.

240)   In the Americans with Disabilities Act context, courts have found that that delay in providing an accommodation amounts to a failure to accommodate. *See e.g., Matos v. Devos*, 317 F. Supp. 3d 489 (D.D.C. 2018).

241)   The 10th Circuit has furthermore held that the principle of delay-as-discrimination translates into the context of religious accommodation. In *Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018).

242)   The 6th Circuit has found in the context of a Title VII religious discrimination claims, that "'a week-to-week, wait-and-see posture' amounts to no accommodation at all." *EEOC*

*v. Robert Bosch Corp.*, 169 F. App'x 942, 945 (6th Cir. 2006) (*citing EEOC v. Arlington Transit Mix, Inc*., 957 F.2d 219, 222 (6th Cir. 1991)).

243)  *Furthermore, in Doster v. Kendall*, No. 1:22-cv-84, 2022 U.S. Dist. LEXIS 125400, at *10-13 (S.D. Ohio July 14, 2022), the court treated both delay and denial of religious accommodation as "injury" for the purpose of class certification analysis in a Religious Freedom Restoration Act / First Amendment case.

244)  Defendants neither requested nor proposed that Plaintiffs participate in any interactive or bilateral discussion to determine a fair and legal accommodation.

245)  Defendants never processed or adjudicated Plaintiffs' requests.

246)  Defendants never explained to Plaintiffs when they would adjudicate or resolve their accommodation requests.

247)  Defendants harmed Plaintiffs by continuing to threaten discipline and termination, while not acting to adjudicate their claims.

248)  Defendants' threats and other actions left Plaintiffs in limbo, without answers and without certainty about the future of their employment for over a year, with the knowledge that they could be terminated at any time.

249)  Defendants harmed Mr. Etzenhouser by denying him entry into his workspace, the ability to travel for work and the opportunity to engage in fire suppression activities. These restriction cost Mr. Etzenhouser substantial compensation as well as loss of career opportunities and the ability to keep his fire certifications up to date to be competitive with others.

250)  Defendants harmed Mr. Rohrer by passing him up for promotions at least one of which, upon information and belief, he was likely the most qualified.

251)  Defendants harmed Mr. Rohrer by creating such an antagonistic and toxic

environment toward him and other religious believers that he was constructively discharged.

252) Defendants harmed Mr. Rohrer and Mr. Etzenhouser by making them choose between their livelihoods and their faith. *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir., 2021) ("Forcing individuals to choose between their faith and their livelihood imposes an obvious and substantial burden on religion . . . vaccine mandates . . . present a crisis of conscience for many people of faith. It forces them to choose between the two most profound obligations they will ever assume – holding true to their religious commitments and feeding and housing their children. To many, this is the most horrifying of Hobson's choices.")

253) The stress of knowing that these difficulties could drop back into their lives at any moment has followed Plaintiffs around for over a year, causing undue stress, creating new health conditions, and often exacerbating preexisting health conditions.

**COUNT III**
**TITLE VII 42 U.S.C. §2000e, *et seq*.**
**RELIGIOUS DISCRIMINATION:**
**DISPARATE IMPACT**

254) Plaintiff restates the foregoing paragraphs as set forth fully herein.

255) Even if Defendants did not intend to discriminate against Plaintiffs based on their religious beliefs, the policy they implemented requiring vaccines of all employees had a disparate impact on employees with religious objections to the vaccine.

256) Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 782.

257) Under the disparate-impact theory of Title VII:

A plaintiff establishes a prima facie violation by showing that an employer uses a particular employment practice that causes a disparate impact on the

basis of race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(k)(1)(A)(i).

An employer may defend against liability by demonstrating that the practice is job related for the position in question and consistent with business necessity. Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs. 42 U.S.C.S. § 2000e-2(k)(1)(A)(ii), (C). See also, *Ricci v. DeStefano*, 557 U.S. 557, 578, (2009).

258)     In this case, Defendants implemented a facially neutral policy requiring COVID-19 vaccines for all employees.

259)     Yet that policy had a disparate impact on religious believers who opposed the vaccine based on sincerely held religious beliefs which was not job related and was not consistent with business necessity.

260)     The vaccine did not stop the spread of the disease and even if it did, upon information and belief, Defendants did not require vaccines of contractors, visitors and others who did not have religious beliefs similar to Plaintiffs.

261)     Alternative means were available to Defendants that would have had less disparate impact on religious believers and still served the Defendants' legitimate needs.


**PRAYER FOR RELIEF**


1.   Plaintiffs respectfully request that the Court:

   a.   Hold unlawful and set aside the Defendant's discriminatory COVID-19 vaccination and testing policies;

   b.   Award appropriate compensatory and punitive damages for injuries suffered;

c. Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act;

d. Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

**JURY TRIAL**

A jury trial is requested in this matter.

Dated: November 27, 2023

Respectfully Submitted,

/s/ E. Scott Lloyd
_____
E. Scott Lloyd
Virginia Bar # 76989
Lloyd, Lemmon, & Hale, PLLC
15 Chester Street
Front Royal, VA 22630
(540) 823-1110
scott@lloydlemmonhale.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I will cause the foregoing to be served upon the Department on or about November 27, 2023.

/s/ E. Scott Lloyd
_____
SCOTT LLOYD